# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2014-KA-00188-COA

JEFFREY ALLEN A/K/A JEFFERY GREY ALLEN          APPELLANT

v.

STATE OF MISSISSIPPI          APPELLEE

| | |
|---|---|
| DATE OF JUDGMENT: | 10/31/2013 |
| TRIAL JUDGE: | HON. ROBERT P. KREBS |
| COURT FROM WHICH APPEALED: | JACKSON COUNTY CIRCUIT COURT |
| ATTORNEYS FOR APPELLANT: | OFFICE OF STATE PUBLIC DEFENDER |
| | BY: GEORGE T. HOLMES |
| | ANDRE DE GRUY |
| ATTORNEY FOR APPELLEE: | OFFICE OF THE ATTORNEY GENERAL |
| | BY: JEFFREY A. KLINGFUSS |
| DISTRICT ATTORNEY: | ANTHONY N. LAWRENCE III |
| NATURE OF THE CASE: | CRIMINAL - FELONY |
| TRIAL COURT DISPOSITION: | CONVICTED OF CAPITAL MURDER AND SENTENCED TO LIFE IN THE CUSTODY OF THE MISSISSIPPI DEPARTMENT OF CORRECTIONS |
| DISPOSITION: | AFFIRMED - 03/03/2015 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

**BEFORE GRIFFIS, P.J., CARLTON AND JAMES, JJ.**

**CARLTON, J., FOR THE COURT:**

¶1. Jeffrey Grey Allen appeals his conviction of capital murder and sentence of life without the possibility of parole. On appeal, Allen claims that (1) the trial court erred in allowing hearsay testimony of alleged prior bad acts and character evidence; and (2) the verdict is not supported by the weight of the evidence. Finding no error, we affirm.

FACTS

¶2.     On March 2, 2011, the Jackson County Sheriff's Department responded to a call about the discovery of the body of Charles Ike Mason Jr.  Sheriff's investigators entered Mason's home and observed that he had been killed by a single gunshot to his back.  Investigators also observed that Mason's left pants pocket was turned out, but investigators found cash in Mason's right pants pocket.  Investigators discovered a Remington .22-caliber spent shell casing on the floor just inside Mason's front door.  The sheriff's department sent Mason's clothing to a laboratory for DNA analysis, specifically to examine the turned-out pocket, but testing recovered no DNA evidence from the clothing.

¶3.     Donna Freeman, Mason's former girlfriend, and Allen were eventually arrested and charged with murdering Mason during the commission of a robbery, in violation of Mississippi Code Annotated section 97-3-19(2)(e) (Rev. 2014).  Freeman and Mason were romantically involved for approximately eight years.  Although Freeman eventually began a relationship with Allen, Mason continued to provide her with money, clothes, automobiles, and other items.

¶4.     On December 7, 2011, Jermaine Sims, a Jackson County jail inmate, informed investigators that Allen had given him "information" relating to Mason's death.  Sims testified Allen told him that on the day of the murder, he was with a female named Donna and a "little young guy," whose name Sims did not know.  Sims testified Allen told him that Freeman shot Mason, and then afterwards, Allen removed $4,000 "out of the left front pocket of the victim."  Sims also testified that Allen told him Freeman went to Mason's home on the day of the murder to ask for money, and that Mason refused to give her any money.  Sims

2

testified Allen said he "went in and got the gun and put another round in it" after Freeman shot Mason. Allen allegedly told Sims that "the young guy" then came into the house after Allen and raised the volume on the television. Allen informed Sims that he threw the rifle in a creek, along with a wallet. Allen then gave the "young guy" some money, and also gave his father $200 to "pay a bill."

¶5. Based on the information gathered from Sims, investigators questioned Joshua Davis. Davis had previously lived next door to Allen and his family, and Davis was friends with Mason. At trial, Davis testified that he, Allen, and Freeman used to smoke spice, a synthetic marijuana, together. Davis testified that on March 1, 2011, Allen and Freeman picked him up at a convenience store to drive Davis to his job at a farm. Davis testified the three smoked spice in the car and ended up at Mason's house. Freeman exited the car, explaining that she was going inside Mason's house to "get some clothes." Davis and Allen remained in the vehicle, smoking spice and listening to the radio. Allen exited the vehicle about five minutes later, but returned to the car within a few minutes. Davis testified that Freeman then came out of the house, hysterical, yelling, "I just shot [Mason], and he's got the gun." Allen got out of the car and tried to calm Freeman down. Davis testified that Allen then asked him to go with him inside the house. Davis stated that he remained on the porch while Allen entered Mason's residence. Davis observed a rifle on Mason's lap, and testified that Allen picked up the rifle and "spun another shell through it in case [Mason] wasn't dead." Davis testified that Allen then took money and a wallet from Mason's left pants pocket. Davis, Allen, and Freeman then left the residence, and Allen threw the wallet, rifle, and Mason's cell phone off of the "Black Creek Bridge."

3

¶6. Davis testified that once they arrived back at his house, Allen gave Freeman some money and "told her if she was to tell anybody, she was going to end up like [Mason]." Allen then gave Davis $300 and told him to keep his mouth shut.

¶7. Davis pled guilty to accessory after the fact to Mason's murder. Although Davis testified that he heard no conversation between Allen and Freeman about robbing Mason on the day of Mason's murder, he testified that two weeks prior, he overheard a conversation between Allen and Freeman during which Allen allegedly told Freeman he knew where Mason hid his money, and they were "going to go and get it," meaning steal Mason's money. When questioned about why he previously told investigators that Freeman exited Mason's house with the rifle and mentioned nothing about observing a rifle on Mason's lap, Davis responded that his "mind was not working right" and that he was intoxicated during the events of March 1, 2011. Davis explained that his memory "just came back to him."

¶8. Investigators interviewed Allen October 25, 2011. During the interview, Allen admitted that he was with Freeman when she shot Mason and that he helped Freeman dispose of the rifle. Allen stated he and Freeman went to Mason's house after dropping Davis off at work so Freeman could borrow some money. He said Freeman went inside Mason's house, and then came out a few minutes later, without a weapon, hysterically saying that she had "shot the gun," but not indicating that she had actually shot Mason. Allen stated that he then went inside and saw Mason still alive, lying on the kitchen floor and complaining repeatedly about his back hurting. Allen said he observed the television on at a high volume. Allen then grabbed the .22 rifle, which was on the floor, and asked Mason what was going on, unaware that Mason had been shot. Allen told investigators that he grew concerned that

4

Mason might try to shoot him, so he left the house and ejected a spent shell casing from the rifle on the way out. Allen said that when he left the house, Mason was still alive and still complaining about his back. Allen and Freeman got back in the car and left, with the rifle.

¶9.    Allen told investigators that as they drove away from Mason's house, Freeman informed him that Mason had tried to "force himself on her," and she physically resisted by slamming Mason against the sink and shooting him. Allen and Freeman then drove to a bridge and threw the rifle into a creek. Allen later showed investigators where he had thrown the rifle, and took them to the location where the rifle was eventually retrieved from a creek. Investigators failed to recover a cell phone or wallet.

¶10.    Regarding Sims's allegation that Allen gave his father money, Allen informed investigators that he and Freeman had pawned several items in the days prior to March 1, 2011. Investigators located several pawn receipts from February 28 through March 1, 2011, with Freeman's and Allen's names on the receipts. At the trial, a video recording of Allen's interview was played for the jury.

¶11.    In addition, the jury heard testimony from nine witnesses — eight of Mason's friends, family, and associates, plus one customer — who all testified that Mason told them that Freeman and Allen were stealing from him. The witnesses also expressed Mason's opinions of Allen's character. The record reflects that Allen filed pretrial motions to exclude the witnesses' testimony as hearsay and as irrelevant prior bad acts and character evidence under Mississippi Rule of Evidence 404(b). The trial court overruled Allen's motions and allowed the testimony.

¶12.    Mason's son, Charles Ike Mason III (Ike), testified that he had known Allen a long

5

time, and that neither he nor any of Mason's other thirteen children liked Freeman "freeloading" off of their father. Ike testified that he spoke to Mason on the telephone a week before Mason's death, and Mason accused Freeman and Allen of stealing his checks. Ike testified that he called Allen and told Allen not to go back out to Mason's house anymore. Ike testified that he also spoke to his father on March 1, 2011, around 5:30 or 6:00 p.m. Ike stated that Mason was cooking turnip greens, and Mason told Ike that he was upset because Freeman and Allen had been out there "arguing or something."

¶13. Allen Tubb, a friend and neighbor of Mason, testified that on March 1, 2011, he went with Mason to purchase a tractor, which they took back to Mason's land. Mason operated a salvage yard from his home, and when Tubb and Mason arrived at Mason's house, customers were waiting for Mason, so Mason asked Freeman to drive Tubb home. Tubb testified that Mason had informed him that Freeman and/or Allen were stealing things from him, so Tubb asked Freeman to drop him off before getting to his house so that Freeman would not know the exact location of his house. Once Tubb arrived home, he realized he had forgotten his jacket, so he drove his four-wheeler back to Mason's house to retrieve his jacket. While he was there, he saw Freeman and Allen, along with a customer. Tubb observed Freeman and Allen getting what appeared to be "clothes and stuff" out of a travel trailer. Tubb overheard Allen say they needed to hurry and leave because Allen was being accused of stealing. Allen and Freeman drove off in a red car.

¶14. Davis Williams also provided testimony. Williams met Mason on March 1, 2011, when he went to Mason's salvage yard to buy parts. According to Williams, Mason told him that "a guy named Jeffrey . . . and a friend [were] coming around and stuff, and . . . that

6

they're no good, and they [were] wanting money, and he said he wasn't giving them no more money." Williams described seeing Freeman and Allen riding in a small red Toyota and asking Mason for money, which Mason refused to give them. Williams returned to Mason's home the next morning to return a part that he had purchased from Mason, and met Tubb, who happened to be there at the same time. The two men then discovered Mason's body.

¶15. Kathy Mason, Mason's former wife, testified that she and Mason were married for thirty-three years and still maintained a good relationship, despite no longer being married. Kathy testified that she assisted Mason with his checking account and with paying bills and taxes for the salvage business. Kathy testified about a conversation she had with Mason on February 26, 2011, where Mason informed Kathy that he was upset because he and Freeman were "having trouble and stuff." Kathy testified that Freeman had been stealing money from Mason and writing checks on his account. Kathy testified that she had Mason's bank statements, and that Freeman's signature was on Mason's returned checks, although Freeman lacked authority to sign his checks. Kathy testified that Mason stated that Freeman "had got her last [money] from him."

¶16. Danyiele Schenk and Mitchel Wright, an unmarried couple, were friends with Mason. Both testified about events that occurred on February 27, 2011. On that date, Mason went to Schenk and Wright's home, looking for a trailer to borrow. Wright was not home, so Schenk met Mason in the yard and they looked at a trailer. Schenk said Mason told her that he and Freeman were having a lot of problems, and that Freeman and Allen would "[hit] him up for money all the time and [steal] things." Mason told Schenk that he was finished dealing with both Freeman and Allen, and that he would not give Freeman any more money.

7

Schenk testified that Mason "didn't like [Allen] at all," that he considered Allen "trouble," and that Freeman "was crazy to be with him."

¶17.  Wright also provided testimony that Mason "didn't think very much" of Allen.  Wright testified that he and Mason talked almost every day.  Wright stated that Mason thought Allen was "a dope head," and he testified that Mason and Allen had engaged in many verbal conflicts.  Wright testified that when Mason returned the borrowed trailer the next day, he told Wright he was through with Freeman and Allen because of money and stealing, and informed Wright that Freeman and Allen were using drugs.

¶18.  Matthew Furby, one of Mason's former employees, identified the rifle pulled from the creek as belonging to Mason.  Furby also provided testimony that Mason told him that Freeman and Allen were stealing from him, and that Mason and Allen were not "seeing eye to eye."  Furby testified that shortly before Mason's death, Mason told him that Freeman and Allen were at Mason's house, and Freeman distracted Mason while Allen "took a couple of things."  Mason confronted Allen about this, and the two argued.

¶19.  Frank Miller, Mason's close friend, testified that he lived with Mason until two weeks prior to his death, explaining that he moved out of Mason's home because "it was trouble in the making, and I didn't want to be around when it happened."  Miller described the "trouble" as issues between Mason, Freeman, and Allen.  Miller stated specifically that Freeman stole checks and money from Mason, and that Allen "composed another little problem" because Mason and Freeman dated, and now Freeman was hanging around Allen.  When questioned about whether Mason told Miller that Allen stole from him, Miller responded: "I don't think he mentioned that, but he mostly mentioned about [Freeman].  I'm sure he did come out there.

8

Most all of them was out there stealing."

¶20.    The jury finally heard testimony from Paula Belk, who lived near Mason and had known him for about fifty years. Belk testified that on the day before Mason's death, Mason told her that Freeman "had gotten involved with a bad guy, and that he hated it for her." Mason also informed Belk that Freeman and Allen stole checks, money, and a gun from him.

¶21.    The jury returned a verdict of guilty of capital murder, and the trial court sentenced Allen to life imprisonment without the possibility of parole in the custody of the Mississippi Department of Corrections. After the denial of post-trial motions, Allen filed this appeal.

## STANDARD OF REVIEW

¶22.    Our well-established "standard of review for admission of evidence is abuse of discretion." *Anderson v. State*, 62 So. 3d 927, 933 (¶13) (Miss. 2011).

¶23.    When reviewing whether the weight of the evidence supports a verdict, this Court "will only disturb a verdict if the verdict is so contrary to the overwhelming weight of the evidence that to allow the verdict to stand would sanction an unconscionable injustice." *Hunt v. State*, 81 So. 3d 1141, 1146 (¶19) (Miss. Ct. App. 2011).

## DISCUSSION

### I.    Hearsay Testimony

¶24.    Allen argues that the trial court erred in allowing hearsay testimony from nine hearsay witnesses of alleged prior bad acts and character evidence attributed to Allen and his codefendant, Freeman. Specifically, Allen claims the jury repeatedly heard that Mason thought Freeman and Allen were stealing money from him; that Allen and Freeman were using drugs; and that Mason thought Allen was "no good," a "bad guy," and a "dope head."

9

Allen claims that the admission of testimony expressing such bad acts was irrelevant, as well as more prejudicial than probative. He argues that no real proof of any prior bad acts by Allen existed, simply testimony about Mason's accusations and suspicions. Allen cites to *Byrom v. State*, 863 So. 2d 836, 847 (¶¶11-13) (Miss. 2003), and submits that repetitive hearsay accusations of being a thief in association with Freeman rendered his trial unfair, as the prejudice was cumulatively insurmountable.

¶25.    The record reflects Allen filed a motion in limine requesting the trial court to exclude and suppress all of the prior-bad-acts testimony and bad character evidence. The State argued in response:

> [I]t would be impossible . . . to tell the whole story of this case without talking about some of those thefts, without talking about the relationships that are involved in this case. . . . The thefts from the victim[ ] led to arguments. The arguments led to the victim saying[,] "I'm not going to give you any more money," [and] led to the robbery, which led to the killing.

The trial court overruled the motion in limine, finding the testimony at issue admissible as motive under Rule 404(b).

¶26.    Rule 404(b) provides:

> Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith. It may, however, be admissible for other purposes such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.

We turn to precedent to guide our review of this assignment of error.

¶27.    In *Pitchford v. State*, 45 So. 3d 216, 245-46 (¶¶121-128) (Miss. 2010), the Mississippi Supreme Court addressed the issue of the admissibility of evidence concerning prior bad acts. The *Pitchford* court found that two evidentiary rules must be considered when determining

whether to admit the evidence:  Mississippi Rules of Evidence 404(b) and 403.[1]  *Pitchford*.

45 So. 3d at 245-46 (¶124).  The evidence must "be relevant to prove a material issue other

than the defendant's character[.]"  *Davis v. State*, 40 So. 3d 525, 530 (¶16) (Miss. 2010)

(quoting *Welde v. State*, 3 So. 3d 113, 117 (¶15) (Miss. 2009)).  Second, "the probative value

of the evidence must outweigh the prejudicial effect."  *Id*.; *see* M.R.E. 403.  The supreme

court has held Rule 403 to be "the ultimate filter through which all otherwise admissible

evidence must pass."  *Davis*, 40 So. 3d at 530 (¶16) (quoting *Welde*, 3 So. 3d at 117 (¶15)).

¶28.    The record herein shows that the trial judge considered the admissibility of this

evidence relative to the permissible purpose provided by Rule 404(b) and the balancing

required by Rule 403.  In the case before us, the transcript shows that when the trial court

ruled on the motion in limine, the trial judge asked the State how it intended to use Allen's

prior bad acts to show motive.  The trial court also observed that "the State apparently is not

concerned about the prejudicial aspects of this."  In response, the State assured the trial court

that it was concerned about prejudice towards Allen, but argued that "under [Rule 403], it

has to be weighed[;] . . . the jury would never be able to understand the case without knowing

that [Allen and Mason] . . . actually have traded licks in the past because of the theft of

property."  We further acknowledge that Allen failed to object to any testimony regarding

his specific bad acts.  Where a party fails to raise a contemporaneous objection to a witness's

---

[1] Rule 403 states:

> Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence.

11

testimony, the party is barred from raising the issue for appellate review. *Walker v. State*, 671 So. 2d 581, 597 (Miss. 1995).

¶29.    A review of the record shows that the trial court herein found the evidence of the prior bad acts to be admissible for the permissible purpose of showing motive. The trial court also heard arguments that the evidence was more probative than prejudicial, and after considering the arguments, the trial court agreed. As stated, we review the trial court's admission of this evidence for abuse of discretion. *Pitchford,* 45 So. 3d at 246 (¶128). After our review, we find no abuse of discretion by the trial court in finding the evidence to be admissible.

## II.    Weight of the Evidence

¶30.    Allen next asserts that the verdict of guilty of capital murder is not supported by the weight of the evidence. Rather, Allen submits that the weight of the evidence presented at trial only supports a conviction of accessory after the fact.[2] Allen argues the capital-murder conviction was not based on credible evidence; rather, he claims that the State's case consisted almost entirely of a "jailhouse snitch," Sims, and an accomplice, Davis.

¶31.    As stated, the standard of review for deciding whether a jury's verdict is against the overwhelming weight of the evidence requires this Court to accept the evidence that supports the verdict as true. *Price v. State*, 898 So. 2d 641, 652 (¶26) (Miss. 2005). This Court will reverse only if convinced, upon review of the record, that the trial court abused its discretion in failing to grant a new trial. *Id*. A new trial will be ordered if a review of the record convinces the Court that the verdict is so contrary to the overwhelming weight of the

---

[2] *See Parks v. State*, 884 So. 2d 738, 744 (¶17) (Miss. 2004) (discussing elements of accessory after the fact).

evidence that allowing the verdict to stand sanctions an unconscionable injustice. *Pearson v. State*, 428 So. 2d 1361, 1364 (Miss. 1983).

¶32. In the present case, the jury received jury instructions from the trial court for capital murder, as well as accessory after the fact. A review of the instructions reflects that the trial court properly instructed the jury on these offenses and their elements. Regarding capital murder, the jury was instructed that if it found

> beyond a reasonable doubt and to exclusion of every reasonable hypothesis consistent with innocence that:
>
> 1. On or about March 1, 2011, in Jackson County, Mississippi;
>
> 2. Jeffrey Grey Allen, alone or in conjunction with another, was willfully, unlawfully, and feloniously engaged in the commission of the felony crime of robbery of Charles Ike Mason, Jr.;
>
> 3. Charles Ike Mason, Jr., a human being, was willfully, unlawfully, and feloniously killed by any person engaged in the commission of said felony crime of robbery; and
>
> 4. Said killing was without authority of law and with or without any design to effect the death of Charles Ike Mason, Jr., and not in necessary self[-]defense;
>
> then you shall find the Defendant, Jeffrey Grey Allen, guilty of capital murder.

¶33. The trial court instructed the jury on the elements of accessory after the fact, explaining: "The court instructs the jury that the term accessory after the fact, as used elsewhere in these instructions, means a person renders assistance once the principal has completed the commission of a felony to avoid being apprehended, arrested, or convicted." *See Parks v. State*, 884 So. 2d 738, 744 (¶17) (Miss. 2004) (discussing elements of accessory

13

after the fact).

¶34. During trial, the jury heard testimony from Davis stating that he overheard Allen and Freeman discussing plans to steal Mason's money. The jury also heard Davis's testimony that he rode to Mason's house with Freeman and Allen on March 1, 2011, the day of the murder. Davis testified that he and Allen remained in the car while Freeman went inside Mason's house. Davis further testified that after Freeman shot Mason, Allen went inside Mason's house and removed money from Mason's pants pocket. Davis observed that Mason was visibly dead when Allen removed the money from Mason's pocket. Davis also stated that Allen threw Mason's gun, wallet, and cell phone into a creek. The jury also heard testimony from Sims that Allen informed him that after Freeman shot Mason, Allen went inside the house and removed money from Mason's pants pocket.

¶35. We recognize that the determination of the credibility of the evidence and the witness testimony lies within the province of the jury. *Waterman v. State*, 822 So. 2d 1030, 1033 (¶11) (Miss. Ct. App. 2002). "It is the responsibility of the jury to resolve conflicts in testimony. 'They may believe or disbelieve, accept or reject the utterances of any witness.'" *Long v. State*, 934 So. 2d 313, 317 (¶15) (Miss. Ct. App. 2006) (quoting *Groseclose v. State*, 440 So. 2d 297, 300 (Miss. 1983)). In acknowledging that the jury determines credibility, we also acknowledge that the record contains sufficient evidence to support the jury's verdict finding Allen guilty of capital murder.

¶36. Viewing the evidence in the light most favorable to the verdict, we do not find the overwhelming weight of the evidence contradicts the jury's verdict of guilty of capital murder. We recognize that all the portions of the testimony that Allen claims lack credibility

14

"could just as easily have been rejected by the jury." Accordingly, we affirm Allen's conviction and sentence.

¶37. **THE JUDGMENT OF THE JACKSON COUNTY CIRCUIT COURT OF CONVICTION OF CAPITAL MURDER AND SENTENCE OF LIFE IN THE CUSTODY OF THE MISSISSIPPI DEPARTMENT OF CORRECTIONS IS AFFIRMED. ALL COSTS OF THIS APPEAL ARE ASSESSED TO JACKSON COUNTY.**

**LEE, C.J., GRIFFIS, P.J., ISHEE, ROBERTS, MAXWELL, FAIR AND JAMES, JJ., CONCUR. IRVING, P.J., AND BARNES, J., CONCUR IN PART AND IN THE RESULT WITHOUT SEPARATE WRITTEN OPINION.**